*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 29**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SALT LAKE CITY CORPORATION and METROPOLITAN WATER DISTRICT
OF SALT LAKE & SANDY,
*Respondents,*

*v.*

MARK C. HAIK and PEARL RATY, as Trustee of the Pearl Raty Trust,
*Petitioners.*

No. 20190091
Heard January 15, 2020
Filed May 18, 2020

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Andrew H. Stone
No. 140900915

Attorneys:

Shawn E. Draney, Scott H. Martin, Danica N. Cepernich,
Salt Lake City, for respondents

Paul R. Haik, Eden Prairie, MN, for petitioners

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, JUSTICE
PEARCE, and JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 The Pearl Raty Trust (the Trust) seeks water for an undeveloped lot it owns in Little Cottonwood Canyon. Although the lot sits in unincorporated Salt Lake County, it falls within Salt Lake City's water-service area. According to the Trust, this makes it an inhabitant of Salt Lake City and thereby entitled to the city's water under article XI, section 6 of the Utah Constitution. The court of appeals rejected this argument. Because the Trust fails to

persuade us that the voters who ratified Utah's Constitution would have considered it an inhabitant of Salt Lake City, we affirm.

**Background**

¶2 This case is the latest episode in the "ongoing saga" between Mark Haik and Salt Lake City (the City) over water access in Little Cottonwood Canyon.[1] The protagonist in this chapter is not Mr. Haik, however, but the Pearl Raty Trust, which owns property next to Mr. Haik's in the Albion Basin subdivision. Both the Trust and Mr. Haik seek water from Salt Lake City so they can develop the lots they own in this subdivision.

¶3 In February 2014, Salt Lake City brought a quiet title action against Mr. Haik and the Trust's predecessor-in-interest, Butler Management Group, over their water rights in the Albion Basin. In response, Butler and Mr. Haik asserted five counterclaims based on their inability to obtain the water necessary to develop their Albion Basin properties. One of these counterclaims, which is the sole subject of this appeal, is that article XI, section 6 of the Utah Constitution obligates the City to supply their properties with water.[2] The district court dismissed Mr. Haik's counterclaim on the basis of *res judicata* because he previously litigated an identical claim in federal court.[3] But because neither Butler nor the Trust was a party to Mr. Haik's

---

[1] *Haik v. Salt Lake City Corp.*, 567 F. App'x 621, 623 (10th Cir. 2014); *Haik v. Salt Lake City Corp.*, 2017 UT 14, ¶ 2, 393 P.3d 285 ("Mr. Haik has spent the better part of the last twenty years asking courts to order Salt Lake City to supply his undeveloped property in the Albion Basin Subdivision with enough water . . . to allow him to build houses on it."). For the other episodes in this saga, *see generally Haik v. Salt Lake Cty. Bd. of Health*, 604 F. App'x 659 (10th Cir. 2015); *Haik v. Town of Alta*, 176 F.3d 488 (10th Cir. 1999); *Haik v. Jones*, 2018 UT 39, 427 P.3d 1155.

[2] Salt Lake City's quiet title claim against Mr. Haik and Butler is part of a larger action against six Albion Basin property owners and the State Engineer over water rights in Little Cottonwood Canyon.

[3] We affirmed this dismissal in *Haik*, 2017 UT 14, ¶ 1. The Tenth Circuit rejected Mr. Haik's claim under article XI, section 6 of the Utah Constitution in *Haik*, 567 F. App'x at 629–631.

federal lawsuit, the district court considered the Trust's counterclaim on its merits.

¶4 The Trust's counterclaim rests on the fact that, although the Albion Basin subdivision is not part of Salt Lake City proper, it falls within the city's approved water-service area.[4] In 1992, the City filed a change application, approved by the State Engineer, allowing it to divert up to 15.75 acre-feet of water annually for thirty-five homes in the subdivision. But even though this gave the City approval to deliver water to the Basin, it is not currently delivering enough water for the Trust and Mr. Haik to develop their empty lots. According to the Trust, the Salt Lake Valley Board of Health will not issue a building permit until its lot is able to receive 400 gallons of water per day. But the City currently supplies only fifty gallons per day to four cabins that already exist in the Basin.

¶5 According to Salt Lake City, even though it has approval to supply the Basin with 400 gallons of water per day, its distribution system does not extend far enough up Little Cottonwood Canyon to reach the Trust's and Mr. Haik's lots. In other words, although the Trust's lot technically falls within Salt Lake City's *approved* water-service area, the City lacks the infrastructure to actually supply the lot with water. Nonetheless, the Trust claims to "stand[] ready, willing, and able to finance the costs of extend[ing]" Salt Lake City's distribution system up the canyon.

¶6 With this context in mind, we now turn back to the Trust's counterclaim, which the district court dismissed in February 2017. According to the district court, the counterclaim "boil[ed] down to a dispute over the proper interpretation of the term 'inhabitant[s]' as used in article XI, section 6," and whether the Trust was an inhabitant of Salt Lake City by virtue of owning property within the City's approved water-service area. To

---

[4] A city's water-service area is not always coterminous with its municipal boundaries. Utah law allows municipalities to "construct, maintain, and operate waterworks" and "sell and deliver the surplus [water] . . . not required by the municipality or [its] inhabitants, to others beyond the limits of the municipality." UTAH CODE § 10-8-14(2). So a city's water-service area includes both the area within its municipal boundaries as well as other geographic areas where it may sell and deliver surplus water.

resolve this dispute, the district court adopted a "common sense meaning of inhabitant" as "someone residing within the corporate boundaries of [a] city"—a definition that does not include the Trust. The district court also concluded that the Trust is not an inhabitant of Salt Lake City because it "merely holds undeveloped property within territory over which the City asserts water rights and extra-territorial jurisdiction." "At best," the district court explained, the Trust "wants to build on the property so others can inhabit it."

¶7    The Trust appealed this ruling and the court of appeals affirmed.[5] In so doing, the court of appeals held that, because the Trust's lot is "beyond the limits" of Salt Lake City, forcing the city to provide its lot with water "would cut directly against that section's purpose."[6] We granted certiorari to determine whether the court of appeals erroneously interpreted article XI, section 6 of the Utah Constitution. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

## Standard of Review

¶8    "On certiorari, we review the court of appeals' decision for correctness, focusing on whether that court correctly reviewed the trial court's decision under the appropriate standard of review."[7] The district court's decision to grant Salt Lake City's motion to dismiss "is a question of law," which the court of appeals reviewed "for correctness."[8]

## Analysis

¶9    Article XI, section 6 of the Utah Constitution provides that "[n]o municipal corporation, shall directly or indirectly, lease, sell, alien or dispose of any waterworks, water rights, or sources of water supply now, or hereafter to be owned or controlled by it." Instead, "all such waterworks, water rights and sources of water supply now owned or hereafter acquired by any municipal

---

[5] *Salt Lake City Corp. v. Haik*, 2019 UT App 4, ¶ 58, 438 P.3d 913.

[6] *Id.* ¶ 66 (internal quotation marks omitted).

[7] *Cheek v. Iron Cty. Att'y*, 2019 UT 50, ¶ 9, 448 P.3d 1236 (citation omitted).

[8] *Id.* (citation omitted).

corporation, shall be preserved, maintained and operated by it for supplying its *inhabitants* with water at reasonable charges."[9]

¶10   The Trust argues that this provision obligates Salt Lake City to supply water to its Albion Basin lot. This argument hinges specifically on the word "inhabitants" in the phrase "supplying its inhabitants with water."[10] The Trust claims it is an inhabitant of Salt Lake City because its lot falls within the City's approved water-service area. And because it is an inhabitant of Salt Lake City, the Trust argues, article XI, section 6 requires the City to supply its lot with water. The court of appeals rejected this argument. Instead, it adopted the district court's interpretation of inhabitant as one who "reside[s] within the corporate boundaries of [a] city."[11] Under this interpretation, because its lot is located outside city limits in an unincorporated part of Salt Lake County, the Trust is not an inhabitant of Salt Lake City. The Trust asks us to reject this interpretation.

¶11 According to the Trust, the court of appeals erred in adopting the district court's interpretation of "inhabitants." Instead of endorsing the district court's "common sense" interpretation, the Trust argues, the court of appeals should have conducted an originalist analysis to determine what the word "inhabitants" meant to the Utahns who ratified our constitution in 1896. And it claims that, were we to perform this analysis, we would conclude that the original understanding of article XI,

---

[9] UTAH CONST. art. XI, § 6 (emphasis added).

[10] The Trust also claims that the phrases "water rights" and "preserved, maintained and operated" support its claim to Salt Lake City's water. But it ultimately admits that the crux of its argument is its claim that "[w]hen a municipality extends its jurisdiction by appropriating [water rights] to serve a specific, limited beneficial use[,] then [it] must serve that beneficial use for the *inhabitants* within that extended jurisdiction." (Emphasis added.) In other words, even if the Trust is correct that the phrases "water rights" and "preserved, maintained and operated" obligate Salt Lake City to follow through with the proposed water use in its approved change application, it would still need to show it is one of the City's inhabitants.

[11] *Salt Lake City Corp. v. Haik*, 2019 UT App 4, ¶¶ 60, 62, 438 P.3d 913.

section 6 obligated cities to supply water to any property within their approved water-service area—even those properties falling outside of a city's corporate boundaries.

¶12 The Trust correctly points out that when interpreting the Utah Constitution, we "seek to ascertain and give power to the meaning of the text as it was understood by the people who validly enacted it as constitutional law."[12] This approach, which "has been our primary mode of constitutional interpretation since the founding of the state,"[13] requires us to determine the "original public meaning" of the constitutional provision in question at the time it was adopted.[14] And while there is "no magic formula" for this determination, "prior case law guides us to analyze [a provision's] text, historical evidence of the state of the law when it was drafted, and Utah's particular traditions at the time of drafting."[15]

¶13 But despite making several arguments based on the text of article XI, section 6, and the historical evidence surrounding its adoption, the Trust fails to persuade us that the Utahns who ratified our constitution understood the word "inhabitants" to encompass any person who owned property in a city's approved water-service area. After reviewing the plain language of article XI, section 6 and several historical sources—including the proceedings of Utah's constitutional convention, the 1898 Utah Code, and interpretations of "inhabitants" adopted by other late-nineteenth century courts—we conclude that the court of appeals did not err in construing the term "inhabitants" to apply only to those who reside within a city's corporate boundaries. So we affirm.[16]

---

[12] *Richards v. Cox*, 2019 UT 57, ¶ 13, 450 P.3d 1074.

[13] *Zimmerman v. Univ. of Utah*, 2018 UT 1, ¶ 25, 417 P.3d 78.

[14] *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 95, 416 P.3d 663 (internal quotation marks omitted).

[15] *S. Salt Lake City v. Maese*, 2019 UT 58, ¶¶ 18–19, 450 P.3d 1092.

[16] In so doing, however, we do not decide whether article XI, section 6 actually imposes an affirmative obligation on cities to provide their inhabitants with water. Although both parties assume this obligation exists, we take no position on this issue or,

(continued . . .)

## I. The Trust is Not an Inhabitant of Salt Lake City Under the Plain Language of Article XI, Section 6

¶14 The Trust focuses its argument on the second clause of article XI, section 6. This clause mandates that "all . . . waterworks, water rights and sources of water supply now owned or hereafter acquired by any municipal corporation, shall be preserved, maintained and operated by it for supplying its inhabitants with water at reasonable charges." According to the Trust, the word "inhabitants" in this clause refers to those residing within a municipal corporation's approved water-service area. We disagree.

¶15 In matters of constitutional interpretation, "our job is first and foremost to apply the plain meaning of the text."[17] "Therefore, our starting point in interpreting a constitutional provision is the textual language itself."[18] When interpreting statutory text, prior case law instructs us to "consider the entire text, in view of its structure and of the physical and logical relation of its many parts."[19] In accordance with this principle, we note that "[a] pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent."[20] The Trust's interpretation is inconsistent with this rule.

---

if such an obligation exists, whether article XI, section 6 is self-executing. We leave these questions open for a case where they are squarely before us and fully briefed.

[17] *In re Gestational Agreement*, 2019 UT 40, ¶ 151, 449 P.3d 69 (Lee, A.C.J. concurring).

[18] *Grand Cty. v. Emery Cty.*, 2002 UT 57, ¶ 29, 52 P.3d 1148.

[19] *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 12, 428 P.3d 1096 (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012)).

[20] SCALIA & GARNER, *supra* note 20 at 144 (emphasis omitted). *See also State v. Quayle*, 71 P. 1060, 1061 (Utah 1903) ("It is a rule of statutory construction, which also applies to the construction of a constitution, that a proviso should be confined to the antecedent next preceding it, unless the contrary intention clearly appears."); 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47:33 (7th ed.) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.").

¶16 In advancing its interpretation of article XI, section 6, the Trust argues that the antecedent of the word "its" in the phrase "supplying its inhabitants with water" is not "municipal corporations" but "water rights." In other words, the Trust reads article XI, section 6 as "all . . . water rights now owned or hereafter acquired by any municipal corporation, shall be preserved, maintained and operated by it" (referring to the municipal corporation) "for supplying *its*" (referring to "water rights") "inhabitants with water at reasonable charges."

¶17 And, building on this reading, the Trust argues that the term "water rights" encompasses a city's approved water-service area because cities hold the rights to the water in their respective service areas. So, under the Trust's proposed interpretation, the phrase "supplying its inhabitants with water" refers to the inhabitants of a city's approved water-service area, not the inhabitants of a city's municipal boundaries. And since the Trust's Albion Basin lot falls within Salt Lake City's approved water-service area, the Trust claims that article XI, section 6 constitutionally obligates the city to supply its lot with water.

¶18 This interpretation violates the rule that a pronoun usually refers to the nearest reasonable antecedent. Under the Trust's interpretation, the pronoun "its" would not refer to the nearest reasonable antecedent—"municipal corporation"—but to "water rights," a noun that appears at the beginning of the sentence.[21]

_____

[21] We note that the nearest-reasonable-antecedent canon is sometimes in tension with a similar rule, the series-qualifier canon. According to this canon, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *Downs v. Thompson*, 2019 UT 63, ¶ 20, 452 P.3d 1101 (citation omitted). But this tension primarily occurs in cases where the modifier in question could apply to either a single term or a series of terms. *See, e.g.*, *id.*; *Lockhart v. United States*, 136 S. Ct. 958, 962–66 (2016) (explaining that the rule of the last antecedent may "be overcome by other indicia of meaning"); *id.*, at 969–73 (Kagan, J., dissenting). So no tension exists here because the debate centers on whether the modifier in question— "its"—applies to one of two single nouns: "water rights" or

(continued . . .)

¶19 Salt Lake City, on the other hand, advances an interpretation of article XI, section 6 that is consistent with the normal use of an antecedent. Under the City's interpretation—which reads the term "inhabitants" to refer to individuals residing within the legal boundaries of the municipal corporation—the antecedent of the pronoun "its" is "municipal corporation," which is the nearest reasonable antecedent. Because the City's interpretation is consistent with the "elementary rules of punctuation and grammar,"[22] and the Trust's interpretation is not, we conclude that "municipal corporation" is the proper antecedent of "its," and that the "inhabitants" referred to in the phrase "supplying its inhabitants with water" are the inhabitants of a municipal corporation.

¶20 The ratification-era definitions of "inhabitant" provided by the parties also support this conclusion. The Trust cites to a nineteenth-century edition of *Webster's American Dictionary*, which defines "inhabitant" in two ways.[23] First, it defines an inhabitant as a "dweller," or one who is "distinguished from an occasional

---

"municipal corporation." And the nearest-reasonable antecedent canon indicates that "its" modifies "municipal corporation."

[22] *Newspaper Agency Corp. v. Auditing Div. of Utah State Tax Comm'n*, 938 P.2d 266, 271 (Utah 1997) (applying the "elementary rules of punctuation and grammar" while interpreting a state administrative rule); *see also State ex rel. Div. of Forestry, Fire & State Lands v. Tooele Cty.*, 2002 UT 8, ¶ 13, 44 P.3d 680.

[23] Although the Trust cites to the 1895 edition of *Webster's American Dictionary*, the exact definition upon which it relies does not appear in the 1895 edition, but in the 1828 edition. *Compare Inhabitant*, WEBSTER'S AM. DICTIONARY 972 (1828) (defining "inhabitant" as "[a] dweller; one who dwells or resides permanently in a place or who has a fixed residence, as distinguished from an occasional lodger or visitor" and as "[o]ne who has a legal settlement in a town, city or parish") *with Inhabitant*, WEBSTER'S AM. DICTIONARY 224 (1895) (defining "inhabitant" as "[o]ne who dwells or resides permanently in a place"). The 1895 edition, which is closer in time to the ratification of our constitution, does not support the Trust's arguments either. As we discuss below, the Trust does not "dwell" or "reside" in Salt Lake City—it merely owns a lot in a subdivision of unincorporated Salt Lake County.

lodger or visitor."[24] It alternately defines inhabitant as "one who has a legal settlement in a town, city or parish."[25] In response, Salt Lake City points us to the first edition of *Black's Law Dictionary*, published in 1891. This dictionary defines "inhabitant" as "[o]ne who resides actually and permanently in a given place, and has his domicile there."[26] The Trust is not an inhabitant of Salt Lake City under any of these definitions.

¶21 The Trust does not fall within these definitions because it does not actually reside in Salt Lake City or even in the Albion Basin. As the district court pointed out, the Trust "merely holds undeveloped property" in the Basin and "wants to build on the property so others can inhabit it." We fail to see how the Trust can "dwell" or "reside" in Salt Lake City by virtue of simply owning a lot in a subdivision in an unincorporated area of Salt Lake County.[27]

¶22 The Trust argues that even if it does not "dwell" in Salt Lake City, it has "legal settlement" there because, under a 1903 Utah statute, those who "continuously resided in any county in [Utah] for a period of four months . . . gain[ed] lawful settlement in such county."[28] In other words, the Trust claims that the voters who ratified Utah's constitution would have considered the Trust an inhabitant of Salt Lake City because it has owned a lot in the Albion Basin for more than four months, giving it "lawful settlement" in the Basin under the 1903 statute. But this statute has no application here. It speaks only to how a person acquires lawful settlement in a county, not a municipality. So the Trust is not included in this definition of inhabitant either.

---

[24] *Inhabitant*, WEBSTER'S AM. DICTIONARY 972 (1828).

[25] *Id*.

[26] *Inhabitant*, BLACK'S LAW DICTIONARY 622 (1st ed. 1891).

[27] We also note that a trust technically does not dwell anywhere. Unlike a corporation, a trust is not a legal person. It is a "form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of its beneficiaries." *In re Hoopiiaina Trust*, 2006 UT 53, ¶ 30, 144 P.3d 1129 (quoting *Banks v. Means*, 2002 UT 65, ¶ 9, 52 P.3d 1190).

[28] *See* 1903 Utah Laws 166.

¶23 In sum, none of these ratification-era definitions of inhabitant apply to the Trust. And the antecedent of the phrase "its inhabitants" in article XI, section 6 is the term "municipal corporation," not the term "water rights." So the plain language of article XI, section 6 does not support the Trust's argument that the word "inhabitants" encompasses those who own property in a municipal corporation's water-service area.[29]

---

[29] Along with citing a ratification-era dictionary, Salt Lake City also cites to data obtained through corpus linguistics. We appreciate Salt Lake City's inclusion of this analysis, but we find it unnecessary to use it here. We do take this opportunity, however, to provide guidance on how parties should use this tool in future cases. "Corpus linguistics is an empirical approach to the study of language in which we search large, electronic databases of naturally occurring language" to "draw inferences about the ordinary meaning of language based on real-world examples." *Richards v. Cox*, 2019 UT 57, ¶ 20, 450 P.3d 1074. This approach is a "powerful tool for discerning how the public would have understood a statute's text at the time it was enacted." *Wilson v. Safelite Group, Inc.*, 930 F.3d 429, 440 (6th Cir. 2019) (Thapar, J., concurring in part and concurring in the judgment). And we encourage parties to use corpus linguistics when "resolving a contest between competing senses of a statutory term." *Bright v. Sorenson*, 2020 UT 18, ¶ 56, --- P.3d ---. In so doing, parties should keep in mind the following points.

First, parties should limit their inquiry to the relevant time period. In this case, for example, the relevant time period encompasses the years surrounding 1896 because the provision at issue—article XI, section 6 of the Utah Constitution—was adopted in 1896. *See, e.g., Richards*, 2019 UT 57, ¶ 21 (limiting a corpus search "to the years surrounding 1986" because that was "the year article X, section 8 [of the Utah Constitution] was [last] amended"). Relatedly, parties should limit their inquiry to the relevant language databases, which are typically distinguished by time period and, in some cases, source material. In this case, for example, one relevant database is the Corpus of Historical American English (COHA), which contains data from newspapers, magazines, and works of fiction and non-fiction from 1810 to 2009. *See Corpus of Historical American English*, ENGLISH-CORPORA.ORG, https://www.english-corpora.org/coha/ (last visited Apr. 29, 2020). This database is relevant here because

(continued . . .)

## II. The Proceedings of the Utah Constitutional Convention Indicate That the Public Would Not Have Considered the Trust to be an Inhabitant of Salt Lake City at the Time of Ratification

¶24 In advancing its argument that those who ratified our constitution would have considered it an inhabitant of Salt Lake City, the Trust also cites to several portions of Utah's constitutional convention. We have long endorsed combing "the record of debates during [Utah's] constitutional convention" for "extrinsic evidence of the framers' intent."[30] This evidence "can inform our understanding"[31] of a constitutional provision's original public meaning by providing "instances of usage of the words" in question "that are likely to reflect the senses in which the words would have been understood by the public."[32] And

---

it provides data from the years surrounding 1896. *See Wilson*, 930 F.3d at 444 (Thapar, J., concurring in part and concurring in the judgment) (searching the COHA for data in the 1960s and 1970s).

Second, we encourage parties to thoroughly examine the "concordance lines" of text produced by a corpus linguistics search and provide a meaningful analysis of the results. Concordance lines are "snippets of search results, centered on the word or phrase searched." James C. Phillips et al., *Corpus Linguistics and "Officers of the United States,"* 42 HARV. J.L. PUB. POL'Y 871, 880 (2019). After running a search in the relevant corpus, "[o]ne can click on a concordance line and see the word[s] or phrase[s]" at issue "in greater context"—typically the sentence in which the word or phrase is used. *Id.* This "qualitative aspect of corpus linguistic analysis" is what "usually provides the best and most important data" about how the word or phrase is being used. *Id. See also Bright*, 2020 UT 18, ¶¶ 57–58 (providing an example of an analysis of "thirty-four concordance lines of text" produced by a corpus search of the phrase "foreign object").

[30] *P.I.E. Emps. Fed. Credit Union v. Bass*, 759 P.2d 1144, 1146 (Utah 1988); *see also S. Salt Lake City v. Maese*, 2019 UT 58, ¶¶ 30–33, 450 P.3d 1092.

[31] *Maese*, 2019 UT 58, ¶ 19 n.6, 450 P.3d 1092.

[32] Lawrence B. Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 B.Y.U. L. REV. 1621, 1656 (2017) (explaining that "drafting history, like any other text from the [historical] period [in question], can shed light

(continued . . .)

after reviewing the framers' use of the word "inhabitant" throughout the convention proceedings, we are not convinced that the public would have considered the Trust an inhabitant of Salt Lake City at the time of ratification.

¶25 Indeed, when debating article XI, section 6, the framers did not discuss the meaning of the word "inhabitants." Instead, their debate centered exclusively on whether to include the phrase "at reasonable charges" in the clause stating that "all such waterworks, water rights and sources of water supply now owned or hereafter to be acquired by any municipal corporation, shall be preserved, maintained and operated for supplying its inhabitants with water at reasonable charges."[33]

¶26 Several delegates objected to the inclusion of the phrase "at reasonable charges" in this clause. Delegate Brigham Henry Roberts proposed striking out the phrase, arguing that regulating water rates "smack[ed] . . . of legislation."[34] He proposed leaving decisions on water rates to local city councils.[35] Others, such as Delegate David Evans, lobbied to keep the phrase so that cities would not "have arbitrary power to make unreasonable charges to the consumers of water."[36] Delegate Franklin S. Richards

---

on the conventional semantic meanings of the words and phrases that comprise the constitutional text"). In relying on evidence from our constitution's drafting history, we keep in mind that "our focus is on the objective original public meaning of the text, not the intent of those who wrote it." *Maese*, 2019 UT 58, ¶ 19 n.6. *See also McDonald v. City of Chicago*, 561 U.S. 742, 828–29 (2010) (Thomas, J., concurring in part and concurring in the judgment) (explaining that statements made during a constitutional provision's drafting history "can assist in [the] process" of discerning the provision's original public meaning "not because [they] demonstrate[] what the draftsmen of the text may have been thinking, but only insofar as [they] illuminate[] what the public understood the words chosen by the draftsmen to mean").

[33] UTAH CONST. art. XI, § 6; 1 *Official Report of the Proceedings and Debates of the Convention* 669–74 (Salt Lake City, Star Printing Co. 1898) [hereinafter *Proceedings*].

[34] *Proceedings*, *supra* ¶ 25 n.33, at 669.

[35] *Id.*, at 670.

[36] *Id.*, at 669.

argued that the phrase struck a balance that would prevent cities from charging "exorbitant" rates, but that would not "prohibit [a] city from charging [any] water rates" altogether.[37] After hearty debate, the delegates voted to retain the phrase.[38]

¶27 Notably absent from this debate is a reference to the meaning of word "inhabitants." But even though the framers did not discuss the meaning of this term, they did use the word in several other contexts. And taken together, their use of "inhabitant" indicates that the public understanding of the word did not encompass those who — like the Trust — did not live within a city's formal boundaries or whom a city could not count among its official population.

*A. The framers used the word "inhabitant" when referring to those living within Utah's official boundaries*

¶28 At other points during the convention, the framers used the word "inhabitant" when referring to the inhabitants *of Utah*. This indicates that they understood the term to refer to those living within a jurisdiction's formal boundaries. For example, when discussing the cost of paying for a convention stenographer, Delegate Moses Thatcher opined that the framers "should have things moved so that our constituents, *the inhabitants of Utah*, and the voters of Utah, will be satisfied, and with respect to this honorable body of men, that they should keep expenses of this Convention down . . . ."[39] And when discussing how to apportion Utah into legislative districts, Delegate Brigham Henry Roberts endorsed a method whereby the legislature would "provide laws for an enumeration of the inhabitants *of the State* in the year of our Lord, 1905, and every tenth year thereafter."[40]

¶29 In addition, when discussing the first draft of article XV, section 1 of the Utah Constitution, which states that Utah's "militia shall consist of all able-bodied male inhabitants of the State," Delegate George Ryan proposed "chang[ing] the word 'citizens' . . . to 'inhabitants,' and strik[ing] out" the phrase "males

---

[37] *Id.*, at 670.

[38] *Id.*, at 674.

[39] *Id.*, at 94 (emphasis added).

[40] *Id.*, at 837 (emphasis added).

who have declared their intention to become citizens."[41] According to Delegate Ryan, once the framers made this change, "'inhabitants' [would] cover[] everything, because if [an able-bodied male] is an alien he could not be forced into service anyway, and if he is exempt under the laws of the U.S., he could not be forced into the State service."[42]

¶30 These references make clear that the framers understood Utah's inhabitants to be the people living within its borders. Delegate Thatcher's statement that the framers' constituents were the "inhabitants of Utah" necessarily implies that Utah's inhabitants are those living within its formal boundaries, as the framers had no representative arrangement with people living in a different state or territory. Similarly, the proposal by Delegate Roberts to perform an "enumeration" of Utah's inhabitants involved counting the people who would make up the state's legislative districts—a practice that, by definition, could not encompass people living outside of Utah.[43]

¶31 In addition, Delegate Ryan's proposal to change "citizens" to "inhabitants" in Article XV, Section 1, strongly suggests that the word "inhabitants" refers to "able-bodied" men living within Utah's borders. As the 1891 edition of *Black's Law Dictionary* explains, "'citizen' and 'inhabitant' are not synonymous"—"[o]ne may be a citizen of a state without being an inhabitant, or an inhabitant without being a citizen."[44] So by replacing the terms "citizen" and "males who have declared their intention to become citizens" with "inhabitants," Delegate Ryan meant to encompass those eligible for militia service who were living within Utah's boundaries. It is difficult to conclude that his understanding of "inhabitants" was broad enough to conscript men living outside of Utah into the state's militia.

---

[41] *Id.*, at 1824.

[42] *Id.*

[43] *See Enumeration Clause*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining the Enumeration Clause of the United States Constitution as a clause "requiring a census of the nation's population for the purpose of apportioning membership in the House of Representatives").

[44] *Citizen*, BLACK'S LAW DICTIONARY 206 (1st ed. 1891).

*B. The framers also used the word "inhabitant" when referring
to those whom a city can count among its official population*

¶32 The framers also used the term "inhabitant" when referring to those whom a city counts among its official population. In discussing the requirements of municipal charters, Delegate Dennis Clay Eichnor "introduced a proposition enabling cities having *more than three-thousand inhabitants* to frame their own charters."[45] In response, Delegate Charles Varian "offer[ed] an amendment" to Delegate Eichnor's proposal whereby "special charters [could] be granted to all cities having a population of [twenty thousand] or more."[46] Delegate Evans referred to Delegate Varian's amendment as one that "would seek to give a city of *a certain number of inhabitants* special charters."[47] And, when debating a provision involving the state's teacher-training college, Delegate Anthony Canute Lund stated his belief "that a little town of *thirty-five hundred or three-thousand inhabitants* is a better place for a normal school than a city."[48]

¶33 The framers' use of "inhabitants" in these instances strongly suggests that they understood the term to refer to those whom a city can count among its official population. It strains credulity to suggest that those who voted on the Utah Constitution would have viewed an entity such as the Trust—which owns undeveloped property within a city's water-service area but outside the city's formal boundaries—as an inhabitant among its formal population.

¶34 In sum, the framers' use of "inhabitant" throughout the convention provides persuasive evidence that, at the time of ratification, the public understood the word "inhabitants" to mean those living within a jurisdiction's formal boundaries or whom a jurisdiction counts among its official population. So our

---

[45] *Proceedings*, *supra* ¶ 25, n.33, at 400 (emphasis added).

[46] *Id.*, at 401.

[47] *Id.*, at 403 (emphasis added).

[48] *Id.*, at 1730 (emphasis added). The term "normal school" refers to a teacher-training college. *See Univ. of Utah v. Bd. of Exam'rs*, 295 P.2d 348, 353 (Utah 1956) (reviewing legislation on Utah's normal school that described the school's curriculum as "practice in teaching and instruction in pedagogy").

review of this historical evidence leaves us unconvinced that this same public would have considered the Trust an inhabitant of Salt Lake City.

## III. The 1898 Utah Code Also Indicates That Those Who Ratified Our Constitution Would Not Have Considered the Trust an Inhabitant of Salt Lake City

¶35  We have previously explained that "certain provisions of the 1898 [Utah] Code . . . can provide persuasive evidence about what the people of Utah would have understood our state constitution to mean."[49] The 1898 Code "holds particular significance" in matters of constitutional interpretation "because it was the first effort to codify the law after adoption of our constitution."[50] And although "we do not expect to find a perfect enshrinement of constitutional principles or a dictionary of constitutional terms" when we consult Utah's first code, it "may help us understand the contemporaneous public meaning of certain constitutional terms and concepts."[51]

¶36 In this case, a review of the 1898 Code leaves us unpersuaded that the people who ratified Utah's Constitution would have considered the Trust an inhabitant of Salt Lake City. Much like the proceedings of the 1895 Constitutional Convention, the 1898 Code provides compelling evidence that the original public meaning of "inhabitants" included only those persons living in a jurisdiction's formal boundaries or whom the jurisdiction counted among its formal population.

¶37  For example, section 169 of the 1898 Code supports the proposition that "inhabitants" refers to those living within a city's corporate boundaries. This section, which governed the incorporation of new cities, provided that

> When the *inhabitants of any part of any county*, not embraced within the limits of any city, shall desire to be organized into a city, they may apply . . . to the board of county commissioners of the proper county . . . to be embraced in such city, and shall have annexed thereto an accurate map . . . and state

---

[49] *S. Salt Lake City v. Maese*, 2019 UT 58, ¶ 46, 450 P.3d 1092.

[50] *Id*. ¶ 45.

[51] *Id*. ¶ 46.

> the name proposed for such city, and shall be accompanied with satisfactory proof of the number of the *inhabitants within the territory embraced in said limits.*[52]

This provision explains how the inhabitants of an unincorporated part of a county could incorporate themselves into a new city. And it states that if they do incorporate, they must provide "satisfactory proof of the number of the inhabitants within the territory" making up the new city.[53] This process presupposes that people living in the unincorporated part of a county are not inhabitants of a city. And it indicates that if a group of them incorporate, they become the inhabitants of the new city. In other words, the drafters of section 169 assumed—at least for purposes of incorporating a new city—that a city's inhabitants include only those who reside "within the territory embraced in [a city's] limits."[54]

¶38 In addition, section 10-1-174 of the 1898 Code, which also governs municipal corporations, suggests that "inhabitants" refers to those whom a city counts among its official population. This provision established "three classes" of municipal corporations.[55] The first class included "[t]hose cities having twenty thousand or more inhabitants," the second class included those with "more than five thousand and less than twenty thousand inhabitants," and the third class included "all other cities."[56] Section 174 is therefore significant because its drafters chose to use the word "inhabitants" when describing the size of a city's population.

¶39 This decision strongly suggests that the drafters of the first Utah Code did not understand the term to extend to those who, like the Trust, are part of a city's water-service area but are not counted among its official population. And if Utah's first legislators would not have considered the Trust an inhabitant of Salt Lake City, we find it difficult to believe that the people they represented would have either. In sum, these sections of the 1898

---

[52] UTAH CODE § 10-1-169 (1898) (emphasis added).

[53] *Id.*

[54] *Id.*

[55] *Id.* § 10-1-174 (1898).

[56] *Id.*

Code provide compelling evidence that the people who ratified the Utah Constitution would not have considered an entity such as the Trust an inhabitant of Salt Lake City.

### IV. The Legal Understanding of "Inhabitant" at the Time of Ratification Did Not Include Entities Like the Trust

¶40 When interpreting the Utah Constitution, we also examine the backdrop of "legal presuppositions and understandings" against which it was drafted.[57] Here, this backdrop indicates that the framers of our constitution "toiled in a legal environment"[58] where the word inhabitant "ha[d] been construed to mean" many things—"an occupant of land; a resident; a permanent resident; one having domicile; a citizen; [and] a qualified voter . . . ."[59] But after reviewing numerous decisions issued around the time of Utah's statehood, we are persuaded that the term "inhabitants" was largely understood by the public as either a synonym for the word "resident" or as something more "fixed and permanent"[60] than residency. We are also persuaded that those who held this understanding would not have considered an entity like the Trust to be an inhabitant of Salt Lake City.

¶41 Many courts tasked with interpreting the word "inhabitant" in the late nineteenth century concluded it was "synonymous with resident."[61] Some reached this conclusion by

---

[57] *Richards v. Cox*, 2019 UT 57, ¶ 13, 450 P.3d 1074 (citation omitted) (internal quotation marks omitted).

[58] *See Maese*, 2019 UT 58, ¶ 34.

[59] *Schmoll v. Schenck*, 82 N.E. 805, 807 (Ind. App. 1907) (explaining that "construction" of the word "inhabitant" "depend[s] upon the connection in which the word is used"); *Brown v. Rushing*, 66 S.W. 442, 446 (Ark. 1902) (same).

[60] *Succession of Givanovich*, 24 So. 679, 680 (La. 1897) (McEnery, J., separate opinion).

[61] *Helle v. Deerfield.*, 96 Ill. App. 642, 643 (1901) ("We thus see that an inhabitant is synonymous with resident, the latter word being more generally used in this country, and probably better understood."); *see also Town of New Haven v. City of Bridgeport*, 37 A. 397, 397 (Ct. 1897) (noting that "the word 'inhabitant' is the same as 'resident,' or one who lives in a place" and that "[a]n
(continued . . .)

drawing on the word's plain meaning.[62] Several cited to the definition of "inhabitant" from the contemporaneous version of *Webster's American Dictionary*[63] — the same definition cited by the Trust — which defined the term as "one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor."[64]

---

inhabitant necessarily implies an inhabitation, an abode, a place of dwelling" (citation omitted) (internal quotation marks omitted)); *State v. Kilroy*, 86 Ind. 118, 120 (Ind. 1882) (concluding that "[t]he word *inhabitant* means one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor" (citation omitted) (internal quotation marks omitted)); *Bechtel v. Bechtel*, 112 N.W. 883, 884 (Minn. 1907) ("An 'inhabitant' . . . is one who has an established residence at a given place."); *State v. Snyder*, 82 S.W. 12, 23 (Mo. 1904) (examining a dictionary and cases from other jurisdictions to determine the difference between the terms "inhabitant" and "usually resident" in a Missouri statute, and concluding that "[a] person who is an inhabitant of a city, county, or state is 'usually resident' therein, and one who is 'usually resident' in a place is ordinarily deemed an inhabitant of such place").

[62] *See, e.g.*, *Town of New Haven*, 37 A. at 397 (noting that "[i]n its general and popular sense, the word 'inhabitant' is the same as 'resident'"); *Helle*, 96 Ill. App. at 643 (explaining that "[t]he word 'inhabitant' is to be given its ordinary significance as used in the statute" in question); *Kilroy*, 86 Ind. at 120 (explaining that, when interpreting the Indiana Constitution, the "[w]ords used" therein "must be accepted in the sense most obvious to the common understanding" and finding that "[a]ccording to the common understanding . . . [t]he word *inhabitant* means one who dwells or resides permanently in a place" (internal quotation marks omitted)).

[63] *Helle*, 96 Ill. App. at 643; *Givanovich*, 24 So. at 680 (McEnery, J., separate opinion); *Bechtel*, 112 N.W. at 884.

[64] *Bechtel*, 112 N.W. at 884. *See also Inhabitant*, WEBSTER'S AM. DICTIONARY 224 (1895) (defining "inhabitant" as "one who dwells or resides permanently in a place"). At least one other contemporaneous dictionary included a similar definition of "inhabitant." *See Snyder*, 82 S.W. at 23 (citing "[t]he Century Dictionary," which defined "inhabitant" as "a resident; one who
(continued . . .)

¶42 But even when courts found that the words "inhabitant" and "resident" were "not synonymous or convertible," they did so because "inhabitant" connoted a more permanent relationship with a specific place than "resident."[65] The Massachusetts Supreme Judicial Court, for example, held that the word "inhabitant" in a statute "referring to liability to taxation" meant "one domiciled."[66] But it also explained that in other contexts, the word implied "something more than domicil[e]" because it "import[ed] citizenship and municipal relations," such as the right to vote.[67] And the Court of Appeals of Maryland noted, in a case involving an absconding debtor, that "inhabitant mean[t] a permanent resident," while "resident" meant "one who resides in a place for an indefinite time."[68]

¶43 According to these cases, courts at the time of Utah's statehood would not have considered an entity such as the Trust to be an inhabitant of Salt Lake City. It is undisputed that the Trust does not reside in Salt Lake City's corporate boundaries.

---

dwells in a place, as distinguished from a transient or occasional lodger or visitor" (internal quotation marks omitted)).

[65] *Field v. Adreon*, 7 Md. 209, 212 (1854); *see also Schmoll*, 82 N.E. at 808 (concluding that "the definition of the word 'inhabitant'" under the Indiana statute in question is "a true, fixed place, from which one has no present intention of moving"); *Givanovich*, 24 So. at 680 (McEnery, J., separate opinion) ("The words 'resident' and 'inhabitant' are not synonymous, the latter implying a more fixed and permanent abode than the former."); *Borland v. City of Boston*, 132 Mass. 89, 95 (1882) (same).

[66] *Borland*, 132 Mass. at 99 (internal quotation marks omitted). At the time of Utah's statehood, domicile referred to a person's "permanent residence," which, "once established . . . is presumed to continue until the contrary is made to appear." *In re Bunting's Estate*, 84 P. 109, 112 (Utah 1906). As the *Borland* court explained, "[a] cosmopolite, or a wanderer up and down the earth, has no residence, though he must have a domicil[e]." 132 Mass. at 95.

[67] *Borland*, 132 Mass. at 97 (citation omitted); *see also Givanovich*, 24 So. at 680 (explaining that "[t]he word 'inhabitant' imports citizenship and municipal obligations.") (McEnery, J., separate opinion).

[68] *Field*, 7 Md. at 212.

And as discussed previously, even if those residing in the Albion Basin could be considered inhabitants of Salt Lake City, the Trust does not actually reside in the Albion Basin.[69] It merely owns a vacant lot in the hope that someone else will one day reside on it. So given that the prevailing legal understanding of "inhabitant" at the time of ratification was synonymous with the word "resident," we are not persuaded that those with this understanding would have considered the Trust to be an inhabitant of Salt Lake City.

¶44 "When we look to the historical record, we hope that it resembles a Norman Rockwell painting—a poignant, straightforward, and easy to interpret representation"—rather than a "Jackson Pollock" where we "find ourselves staring at the canvas in hopes of finding some unifying theme."[70] This case strikes us as a Rockwell. Neither the plain language of article XI, section 6 nor the significant historical evidence before us supports the Trust's claim that it would have been considered an inhabitant of Salt Lake City in 1896.

### Conclusion

¶45 The Trust fails to persuade us that the people who ratified Utah's constitution understood the word "inhabitants" to encompass any person who owned property in a city's approved water-service area. Indeed, the plain language of article XI, section 6, the proceedings of Utah's constitutional convention, the 1898 Utah Code, and the interpretations of "inhabitant" adopted by other late-nineteenth century courts all point to the opposite conclusion. We affirm.

---

[69] *See supra* section I.

[70] *Maese*, 2019 UT 58, ¶ 29.